**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>v.<br><br>VICENCIO OLEA-MONAREZ ,<br>OMAR FRANCISCO ORDUNO-RAMIREZ,<br>JUAN CARLOS ALVAREZ, AND<br>HERBERT LEE SAYSOFF<br><br><br>      Defendants. | Case No. 14-20096-01/07/09/10-JAR |

## MEMORANDUM AND ORDER

This matter comes before the Court on Defendants Herbert Lee Saysoff and Vicencio Olea-Monarez's Motions to Suppress Wiretap Evidence (Docs. 158 and 178, respectively). Saysoff is joined in his motion to suppress by Defendant Juan Carlos Alvarez. Olea-Monarez is joined in his motion to suppress by Defendant Omar Francisco Orduno-Ramirez. The Court held a hearing on February 10, 2016, during which the parties presented arguments as to their respective motions. The motions are fully briefed and the Court is prepared to rule. For the reasons stated below, the Court denies Defendants Saysoff and Olea-Monarez's motions to suppress wiretap evidence.

**I.    Background**

In July 2012, the Federal Bureau of Investigation (FBI) began an investigation into Vicencio Olea-Monarez, Rosalio Chinchilla, and other named Defendants after the FBI obtained information that a drug trafficking organization was operating out of Kansas City, Kansas. Beginning in October 2013, the FBI conducted eight controlled purchases of methamphetamine from Olea-Monarez and others through the use of three confidential human sources (CHSs).

Although the Government identified several locations of suspected drug activity, most of these sales were conducted at or near an auto shop believed to be owned by Olea-Monarez in Kansas City, Kansas.

Through the use of CHSs, surveillance, other traditional investigative techniques, and information gained from two wiretap authorizations granted in late 2013,[1] the Government learned about various aspects of the suspected conspiracy. For example, the Government believed that Olea-Monarez was responsible for coordinating shipments of methamphetamine from Mexico and California to Kansas City, Kansas, and that Chinchilla distributed methamphetamine for Olea-Monarez from his auto shop. The Government also had information that Casimiro Vargas was involved in supplying Olea-Monarez with methamphetamine and collecting debts from drug purchases. Additionally, the Government learned from a confidential source that Olea-Monarez employed at least one courier who made multiple trips between Mexico and Kansas City, Kansas, to deliver methamphetamine shipments.

Beginning in May 2014, the Government filed wiretap applications for several cellular telephones believed to be associated with the conspiracy. In total, the Government obtained seven orders from May to August 2014 authorizing thirty-day interception periods on eight different Target Telephones.[2] Each wiretap application was supported by an affidavit prepared by FBI Special Agent Timothy Swanson that described the goals of the investigation in learning about the scope, leadership, and operating locations of the conspiracy. The affidavits also

---

[1] These wiretap orders were granted on November 7, 2013, and December 18, 2013, by United States District Judge Kathryn H. Vratil in case numbers 13-CM-80067-KHV and 13-CM-80127-KHV, respectively. Defendants do not challenge the validity of these wiretap authorizations.

[2] Target Telephone #1 belonged to Chinchilla and Target Telephones #2 through #8 belonged to Olea-Monarez.

explained the need for wiretaps based on the difficulty and lack of success in using other investigative techniques. These sections are explained in further detail below.

In the course of intercepting communications during each wiretap period, the Government gained additional information related to the alleged conspiracy. Each affidavit provided information that the Government learned during previous wiretap periods regarding specific methamphetamine transactions, money wires, and unidentified customers and associates. Specifically, in the affidavit for the fourth wiretap order,[3] the Government explained that it had learned that several telephone numbers from Mexico, Arizona, Minnesota, and California were in contact with Target Telephones related to Olea-Monarez, but the Government could not determine the identities of these callers. In the affidavit for the sixth wiretap order,[4] the Government explained that it had learned that Hector Javier Valdez and Omar Francisco Orduno-Ramirez acted as money and drug couriers for Olea-Monarez. In the affidavit for the seventh wiretap order,[5] the Government explained that it had learned of Herbert Lee Saysoff's participation in the conspiracy as a customer of Olea-Monarez. The Government also named additional Target Subjects in each affidavit based on previous wiretap intercepts.

On August 29, 2014, Olea-Monarez, Chinchilla, and Jose Luis Silva-Cardona were charged by complaint. On August 31, 2014, the Government conducted a coordinated "take-down" in which these individuals and Gabriel Agustin Lopez were arrested. Lopez was charged by complaint on September 2, 2014. The remaining six Defendants were charged by complaint or indictment between September 5, 2014, and October 22, 2014.

---

[3] Doc. 158-1.
[4] Doc. 158-2
[5] Doc. 184-7.

**II.     Discussion**

Defendant Olea-Monarez challenges the sufficiency of the first wiretap authorization and all subsequent authorizations on the basis that the affidavits in support of these wiretaps did not meet the necessity requirement set forth under 18 U.S.C. § 2518(1)(c).[6] Defendant Orduno-Ramirez joins in this motion. Defendant Saysoff challenges the wiretap authorizations for Target Telephones #4 and #6, also arguing that the affidavits in support of these authorizations did not meet the necessity requirement. Saysoff is joined in his motion by Defendant Alvarez. Defendants argue that necessity was lacking because the Government had met the objectives of its investigation before applying for wiretaps and because the affidavits did not demonstrate that normal investigative procedures had failed or were likely to fail if used.

**A.     Legal Standard**

Under 18 U.S.C. § 2518(1)(c), each wiretap application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."[7] Additionally, before authorizing a wiretap investigation, a court must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."[8] "Normal" investigative procedures include standard physical and video surveillance, questioning of witnesses and participants in the crime (including through the use of grand juries), executing search warrants, and the use of undercover agents or

---

[6] Although Olea-Monarez challenges the basis of necessity for all wiretap authorizations, he specifically addresses only the first wiretap affidavit.

[7] 18 U.S.C. § 2518(1)(c).

[8] 18 U.S.C. § 2518(3)(c).

confidential informants.[9] "This rule is known as the 'necessity' requirement."[10] The purpose of this requirement is to "ensure that the relatively intrusive device 'is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'"[11]

In determining whether a wiretap application is supported by a showing of necessity, a court must consider "all the facts and circumstances" and read the necessity requirement "in a common sense fashion."[12] To meet the necessity requirement, the government need not exhaust all other conceivable investigative procedures before resorting to wiretapping.[13] Rather, if any traditional investigative techniques are not used, the government must explain with particularity why it did not employ these techniques.[14] Once a wiretap application is authorized, the defendant bears the burden of proving that the authorization was invalid.[15] "If a defendant succeeds in showing that the necessity requirement was not met, evidence seized pursuant to the wiretap must be suppressed."[16]

To establish standing to challenge the validity of a wiretap application, a defendant must demonstrate that he or she is an "aggrieved person" under the meaning of 18 U.S.C. §

---

[9] *United States v. Zapata*, 546 F.3d 1179, 1185 (10th Cir. 2008) (citing *United States v. Killingsworth*, 117 F.3d 1159, 1163 (10th Cir. 1997)).

[10] *Id.* (citing *United States v. Mondragon*, 52 F.3d 291, 293 (10th Cir. 1995)).

[11] *United States v. Edwards*, 69 F.3d 419, 429 (10th Cir. 1995) (quoting *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974)).

[12] *United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 (10th Cir. 2002) (citing *United States v. Nunez*, 877 F.2d 1470, 1472 (10th Cir. 1989)).

[13] *Zapata*, 546 F.3d at 1186 (quoting *Edwards*, 69 F.3d at 419).

[14] *Ramirez-Encarnacion*, 291 F.3d at 1222 (citing *United States v. Mitchell*, 274 F.3d 1307, 1310 (10th Cir. 2001)).

[15] *United States v. Cline*, 349 F.3d 1276, 1280 (10th Cir. 2003) (quoting *Ramirez-Encarnacion*, 291 F.3d at 1222).

[16] *Id.* (citing *Ramirez-Encarnacion*, 291 F.3d at 1222).

2518(10)(a).[17] An "aggrieved person" is defined as "a person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed."[18] To meet this definition, a defendant must generally show that "(1) he was a party to the communication, (2) the wiretap efforts were directed at him, or (3) the interception took place on his premises."[19]

B. Standing

The Government does not question Olea-Monarez's standing to challenge the wiretaps, as he was either identified as a Target Subject or intercepted under each wiretap order. However, the Government argues that Olea-Monarez cannot challenge the validity of all of the affidavits by simply referring to the first affidavit because the later affidavits are "vastly different" from the original affidavit. The Government also challenges Orduno-Ramirez's standing. Orduno-Ramirez was intercepted over Target Telephones #2, #4, #5, #6, and #7, and was listed as a Target Subject for Target Telephone #8 but not intercepted over that phone. Orduno-Ramirez was not listed as a Target Subject or intercepted over Target Telephone #1. Therefore, the Government argues, Orduno-Ramirez lacks standing to challenge the wiretap order for Target Telephone #1. Further, the Government contends that Orduno-Ramirez waives any arguments as to Target Telephones #2, #4, #5, #6, #7, and #8 because Olea-Monarez's motion does not address these phones specifically. The Government does not challenge Saysoff's standing, as he was intercepted over Target Telephones #4 and #6. The Government also does not challenge Alvarez's standing. However, it notes that because Alvarez was intercepted over Target

---

[17] *United States v. Donovan*, 429 U.S. 413, 442 (1977) ("Standing to object to intercepted communications is conferred upon '(a)ny aggrieved person'").

[18] 18 U.S.C. § 2510(11).

[19] *United States v. Faulkner*, 439 F.3d 1221, 1223 (10th Cir. 2006) (citing *United States v. Apple*, 915 F.2d 899, 905 (4th Cir. 1990)).

6

Telephones #1, #2, and #6, and because Saysoff's motion only challenges the affidavits for Target Telephones #4 and #6, Alvarez waives any challenge to the evidence from Target Telephones #1 and #2.

The Court finds that the Defendants have standing to challenge the necessity of the challenged wiretaps in this case. Although Olea-Monarez's motion specifically describes only the first affidavit, his arguments as to necessity apply generally to all of the affidavits.[20] Similarly, Saysoff's motion to suppress makes arguments as to the goals of the investigation and the traditional investigative techniques described in each affidavit. Thus, the Court finds that the Defendants have standing to challenge the affidavits for the Target Telephones over which they were intercepted or listed as Target Subjects.

### C.   Goals of the Investigation

Defendants argue that the Government cannot establish necessity because the stated goals of the wiretap investigation were already reached at the time the Government applied for wiretaps. The Government responds that it had not achieved the main goals of the investigation at the time it submitted wiretap applications. Each affidavit describes the following goals of the investigation:

   a. Discovering the full scope and identification of key personnel involved in illegal drug trafficking on behalf of **OLEA-MONAREZ, CHINCHILLA, the Target Subjects** and their drug trafficking organization;
   b. Discovering the identities and roles of all suppliers of methamphetamine, in addition to **OLEA-MONAREZ** and **C. VARGAS,** and/or other controlled substances to the identified conspirators;
   c. Discovering the identity of the main customers of the **Target Subjects;**
   d. Discovering the stash locations in Kansas City, Kansas; Riverside, California; and other locations still unknown where methamphetamine and/or other controlled substances are stored prior to distribution;

---

[20] Doc. 167 at 15–22 (addressing traditional investigative techniques that are discussed in each affidavit).

7

e. Discovering the management and disposition of proceeds generated by the drug trafficking organization through [] identification of real estate or personal property purchased with drug proceeds[]; and
f. Obtaining admissible evidence which demonstrates beyond a reasonable doubt that the **Target Subjects** and any later identified targets, committed the alleged violations of law set forth herein.[21]

Defendant Olea-Monarez asserts that before the Government had applied for any wiretap orders, it already knew the following information: (1) that co-Defendant Vargas was one of Olea-Monarez's methamphetamine suppliers; (2) that confidential human sources made controlled purchases of methamphetamine from several members of the conspiracy; and (3) that an undercover agent was successfully introduced to Olea-Monarez and offered five pounds of methamphetamine per week.[22] Olea-Monarez contends that based on this information, the Government had ample evidence to proceed with the prosecution of the conspiracy.

Defendant Saysoff similarly argues that the Government had already met these objectives before obtaining wiretap authorizations for Target Telephones #4 and #6. Saysoff contends that the Government listed almost all of the named Defendants in this case as Target Subjects in its wiretap applications, which shows that it knew of key personnel in the organization. Further, Saysoff argues that the Government knew that Olea-Monarez was the leader of the organization based on controlled buys, surveillance, and other traditional investigative techniques. He also asserts that the Government knew early on about the nature, scope, places, and methods of the conspiracy, and knew the locations of several stash houses before obtaining wiretaps. Finally, at the February 10 hearing, counsel for Saysoff argued that the objectives of the wiretap investigation were overly broad and illusory.

---

[21] Doc. 167-1 at 57–58.

[22] Doc. 167 at 16–17.

The Government responds that it could not have prosecuted Olea-Monarez or the other members of the conspiracy with the crimes they are charged with now. The Government also argues that it had not met the objectives of the investigation at the time it applied for wiretaps on Target Telephones #4 and #6. It notes that only four of the ten Defendants were listed as Target Subjects in the Target Telephone #4 affidavit, and that only seven of ten were listed in the Target Telephone #6 affidavit. The Government concedes that it listed several addresses as suspected stash houses in the affidavit for Target Telephone #6, but argues that it did not have enough information to know the specific use for each location or to establish probable cause to search these locations.

As an initial matter, the Court finds that the objectives of the investigation were not overly broad or illusory. The Tenth Circuit has found that goals similar to those listed in the Government's affidavit are appropriate.[23] Further, the Court finds that necessity was not lacking based on the Government having achieved the objectives of the investigation at the time it applied for wiretaps. Although the Government suspected at the time it submitted its first wiretap application that Olea-Monarez was the leader of the organization, the Government did not know of the scope of the conspiracy, the main suppliers to Olea-Monarez, the locations of several stash houses, or the existence of the marijuana grow operation. As the wiretap investigation progressed, the Government continued to add Target Subjects and learn more about the scope of the organization.[24] Even late in the wiretap period, the Government did not know

---

[23] *See, e.g., United States v. Foy*, 641 F.3d 455, 465 (10th Cir. 2011) ("we have held on numerous occasions that the law enforcement goal of uncovering the size and scope of the conspiracy may justify the authorization of wiretaps"); *United States v. Johnson*, 645 F.2d 865, 867 (10th Cir. 1981) (noting that "[t]he FBI was properly concerned [] with identifying all of the members of the conspiracy, as well as the precise nature and scope of the illegal activity").

[24] The first affidavit listed six Target Subjects; the fourth affidavit (for Target Telephones #2, #3, and #4) listed ten Target Subjects; the sixth affidavit (for Target Telephones #2—first extension, #5—first extension, and #6) listed 26 Target Subjects.

the identities of certain customers and members of the organization.[25] Indeed, several named Defendants, including Valdez, Orduno-Ramirez, and Saysoff, were not named as Target Subjects until the last two wiretap applications. Thus, although the Government learned about various aspects of the conspiracy throughout its investigation, the Government did not achieve the objectives of the investigation until the end of the wiretap period.

### D. Normal Investigative Procedures

Defendants also argue that the Government failed to adequately show that normal investigative procedures were tried and failed, were unlikely to succeed, or were likely to be too dangerous if tried. Each affidavit that the Government submitted contains a section asserting the need for wiretaps and describing the use of normal investigative procedures. These affidavits are detailed and extensive, ranging from 90 to 144 pages in length. The explanations as to the normal investigative procedures are largely similar in each affidavit, except for additional factual statements that were added to later applications.[26] Although the Court views the success of normal investigative procedures in totality,[27] a discussion of each procedure described in the affidavits is set forth below.

#### (1) Confidential Human Sources and Undercover Agents

The affidavits described the use of three confidential human sources (CHSs) in conducting controlled purchases of methamphetamine from Olea-Monarez and Chinchilla. Agent Swanson stated that the CHSs provided limited information about the organization, but they could not provide information about the organization's distribution networks and suppliers

---

[25] The final affidavit named 29 Target Subjects, seven of which were listed as unidentified males who were believed to be involved in the organization. *See* Doc. 184-7 at 7–14.

[26] *See United States v. Wright*, 156 F. Supp. 2d 1218, 1225 (D. Kan. 2001) (explaining that such similarities are to be expected in cases involving multiple wiretap applications for phones belonging to one or two parties).

[27] *United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 (10th Cir. 2002) (citing *Nunez*, 877 F.2d at 1472).

or the relationship between Olea-Monarez, Chinchilla, and Vargas. Further, the affidavits described the use of an undercover agent from the Department of Homeland Security based in Springfield, Missouri. The agent was introduced to Olea-Monarez in October 2013, and Olea-Monarez offered to deliver five pounds of methamphetamine to the agent each week. Ultimately, the Government did not pursue this relationship because the agent was located several hours away from Olea-Monarez, the Government did not believe Olea-Monarez would introduce the agent to the main sources of methamphetamine supply, and Olea-Monarez stopped using the telephone number that he had provided to the agent.

Defendants argue that the CHSs provided valuable information to the Government, including names, telephone numbers, and information about their own distribution activities related to the drug organization. Defendants also contend that the success of the undercover agent was shown by Olea-Monarez offering to provide the agent five pounds of methamphetamine per week shortly after the agent's introduction. According to Defendants, this introduction demonstrates that the agent would have eventually been introduced to Olea-Monarez's sources of supply and the organization's day-to-day operations. Although the Court recognizes that the CHSs provided valuable information to the Government and that the agent was successfully introduced to Olea-Monarez, the Court finds that the Government adequately explained the limitations of the CHS information and the reasons it chose not to continue with the use of an undercover agent.

### (2) Photographic and Physical Surveillance

The affidavits describe how photographic and physical surveillance was of limited utility in learning about the operation of the organization. Agent Swanson asserted that physical surveillance can identify relationships, but not the nature of those relationships. Swanson also

emphasized the risks of alerting the Target Subjects to the investigation through the continued use of physical surveillance. Defendants argue that the Government's statement concerning the limited utility of surveillance is conclusory, and they highlight the success of surveillance in corroborating the statements of CHSs and providing additional information about the conspiracy. Based on its review of the affidavits, the Court finds that the Government adequately explained the limitations of physical and photographic surveillance in identifying the participation but not the roles of various members of the conspiracy.[28] Further, considering that the Government observed several members of the conspiracy warning each other about police surveillance,[29] the Court is convinced that continued use of physical surveillance would have risked alerting members of the organization to the investigation.

### (3) GPS and Cell Site Data

The affidavits explained that the Government considered using GPS tracking devices on Olea-Monarez's vehicles, but decided not to do so because he frequently used a variety of vehicles, making GPS tracking impractical. Further, Agent Swanson stated that tracking devices might have been discovered during maintenance at the auto shop or when members of the organization accessed hidden compartments in the vehicles. Agents also used cell site data to gain information about the locations of Chinchilla and Olea-Monarez's phones. This information did not, however, identify the users of the telephones or the content of the conversations over the phones. Defendant Saysoff points to the success of cell site data in identifying and corroborating the movements and properties of the Target Subjects.

---

[28] *See* Doc. 184-1 at 108–15 (describing results of photographic and physical surveillance prior to first wiretap period).

[29] *E.g.* Doc. 158-1 at 39 (describing phone call in which Chinchilla warned Olea-Monarez of police surveillance); *id.* at 44–45 (same).

### (4) Search Warrants

The affidavits stated that the execution of search warrants would not be feasible because not all of the locations the organization used to store drugs were known. Thus, evidence seized would implicate only the individuals directly associated with it, and not the entire organization. Agent Swanson also stated that executing search warrants without knowing the full scope of the conspiracy would potentially alert the organization to the investigation and prevent identification of additional subjects. Defendants argue that the Government's failure to use search warrants was not justified by its lack of knowledge of all the locations the organization used to store drugs. Specifically, Defendant Olea-Monarez suggests that the Government could have learned about additional stash locations by executing search warrants.[30] The Court recognizes that the Government likely could have gained additional information about the conspiracy by executing search warrants. However, the Court also credits the Government's concern that isolated search warrants might have alerted the organization to the investigation and left the Government with limited evidence as to the larger conspiracy.

### (5) Trash Searches and Mail Covers

The affidavits also explain why the Government did not use trash searches or mail covers as part of its investigation. Agents did not use trash searches because a successful search would simply identify the searched location as involved in the conspiracy, and officers already knew that Olea-Monarez's auto shop was involved. Additionally, Agent Swanson stated that a trash search likely would not uncover substantial evidence because drug trafficking is not a document-intensive crime and because investigators had not seen trash placed at the curb of Olea-Monarez's auto shop. The Government did not use mail cover requests because there was no

---

[30] Doc. 167 at 19.

indication that the organization was using the United States Postal Service in furtherance of drug trafficking. Agent Swanson also explained that he was not certain that mail carriers could be relied upon to perform the task without compromising the investigation.

Defendants argue that trash searches and mail covers could have resulted in valuable evidence. They contend that information gained from trash pulls, such as phone numbers, aliases for conspirators, and writings related to the organization, could have provided probable cause to support the search of several locations related to the conspiracy. Defendants also argue that mail carriers are routinely tasked with implementing mail covers, and thus the Government's concern with the reliability of this investigative technique is unwarranted. The Court is satisfied with the Government's explanation as to why it did not use trash pulls or mail covers. Aside from the adequacy of this explanation, the Tenth Circuit has never held that trash pulls or mail covers constitute normal investigative procedures that must be addressed by the government.[31]

### (6) Financial Investigation and Grand Jury Subpoenas

The Government also explained a financial investigation into the money laundering efforts of the organization, which investigators conducted before and throughout the wiretap phase. During a previous wiretap period on January 11, 2014, the Government intercepted a call in which Vargas requested that Olea-Monarez send funds to a Wells Fargo bank account that Vargas owned. As a result of this intercept, a grand jury subpoena was sent to the bank to obtain records related to financial transactions involving the account. Although the Government asserts that this financial investigation continued throughout the wiretap phase, Agent Swanson stated in the affidavits that such an investigation would yield limited success because members of the

---

[31] *See United States v. McDowell*, No. 09-20144-JWL, 2011 WL 830534, at *3 (D. Kan. Mar. 2, 2011) (citing *United States v. Verdin–Garcia*, 516 F.3d 884, 890 (10th Cir. 2008)) ("the Tenth Circuit has not recognized the use of trash pulls as a traditional investigative technique that must be considered before wiretaps become necessary"); *see also United States v. Killingsworth*, 117 F.3d 1159, 1163 (10th Cir. 1997) (listing traditional investigative techniques recognized in Tenth Circuit).

conspiracy frequently dealt in cash and drug traffickers routinely list properties bought with drug proceeds in other people's names. Agent Swanson also stated that he believed grand jury subpoenas of individuals in the organization would not be successful because these individuals would likely invoke their Fifth Amendment privilege not to testify. Defendant Olea-Monarez argues that the Government did not properly account for the success of the financial investigation in revealing residences and a business associated with the organization. Having reviewed the affidavits, the Court finds that the Government gave appropriate weight to the success and limitations of the financial investigation and the grand jury subpoena process.

### (7) Pen Register Data and Subscriber Information

The affidavits explained the use of pen register data and subscriber information to identify contacts related to Olea-Monarez and Chinchilla, as well as several unidentified numbers in other states. However, this information did not reveal whether the identified numbers were tied to the organization. Additionally, Agent Swanson stated that several Target Telephones were registered in names other than that of the owner, and therefore subscriber information could not be relied upon to accurately reveal the identity of the person using the phone. Defendants generally emphasize the value of using pen register data and subscriber information in conjunction with other normal investigative procedures.

### (8) Normal Investigative Procedures as a Whole

Viewing the success and limitations of these normal investigative procedures as a whole, the Court cannot find that Defendants have met their burden of establishing the lack of necessity for wiretaps in this case. The necessity requirement does not require the government to exhaust all other investigative techniques before turning to wiretapping.[32] Even so, the Government here

---

[32] *Zapata*, 546 F.3d at 1186 (quoting *Edwards*, 69 F.3d at 419).

used all of the normal investigative procedures that it discussed, except for trash pulls, mail covers, search warrants, and GPS tracking of vehicles. The Tenth Circuit does not include GPS tracking, trash pulls, or mail covers in the list of normal investigative procedures that the government must address before seeking wiretap orders.[33] However, the Government explained in the affidavits why it did not use each of these techniques.

The Government also provided detailed explanations as to the results of the traditional investigative techniques that it did use. Traditional techniques provided information such as phone numbers, locations of suspected stash houses, contacts of the organization's leaders, and instances of specific drug transactions. As the affidavits demonstrate, however, normal investigative procedures did not reveal the scope of the conspiracy, and the identities and roles of many members of the organization remained unknown even as the wiretap investigation progressed.

This is not a case of the government failing to address the necessity of wiretaps, or seeking wiretap authorization after using only one or two normal investigative procedures without explaining why it did not use other procedures.[34] To the contrary, here the Government spent many pages describing the results of the normal investigative procedures it used, explaining why it did not use certain procedures, and stating what it knew about the organization during each wiretap period.[35] For these reasons, the Court concludes that the Government met

---

[33] *See Killingsworth*, 117 F.3d at 1163.

[34] *See Mondragon*, 52 F.3d at 293–94 (reversing district court's finding of necessity because supplemental wiretap affidavit "completely fail[ed] to address the necessity requirement"); *United States v. Castillo-Garcia*, 117 F.3d 1179, 1194 (10th Cir. 1997) (holding that necessity requirement not met because wiretap application relied on conclusory statements and previous investigative techniques were visual surveillance of only two suspects in large conspiracy, and use of background checks, pen registers, and trap-and-trace devices against only few co-conspirators), *overruled on other grounds by Ramirez-Encarnacion*, 291 F.3d at 1222 n.1.

[35] *See United States v. Barajas*, 710 F.3d 1102, 1107–08 (10th Cir. 2013) (affirming district court's finding of necessity where affidavits explained why traditional investigative techniques were ineffective and why other

the necessity requirement by providing "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."[36] Therefore, the Court denies Defendants' motions to suppress evidence obtained as the result of the wiretap investigation in this case.

### E. *Franks* Hearing

Defendant Olea-Monarez requests a *Franks* hearing in three footnotes in his motion to suppress.[37] In each footnote, Olea-Monarez alleges that the affidavits fail to disclose the nature and extent of the prior investigation that led to the investigation of this conspiracy. The Tenth Circuit has explained that a *Franks* hearing is warranted when a defendant demonstrates that an affidavit contains an intentional or reckless material falsehood or a material omission that would have prevented a finding of necessity.[38] "The standards of deliberate falsehood and reckless disregard set forth in *Franks* apply to material omissions, as well as affirmative falsehoods."[39] Here, Olea-Monarez does not contend that the affidavits contain any deliberate material falsehoods or that the Government deliberately omitted information that would have prevented a finding of necessity. Accordingly, the Court denies Olea-Monarez's request for a *Franks* hearing.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motions to Suppress Wiretap Evidence (Docs. 158 and 167) are **denied.**

**IT IS SO ORDERED.**

---

techniques would prove ineffective if tried, and supplemental affidavits included new details learned about drug organization).

[36] 18 U.S.C. § 2518(1)(c).

[37] Doc. 167 at 3, 4, 7.

[38] *United States v. McDowell*, 520 F. App'x 755, 759 (10th Cir. 2013) (quoting *United States v. Yeje-Cabrera*, 430 F.3d 1, 8 (1st Cir. 2005)).

[39] *United States v. McKissick*, 204 F.3d 1282, 1297 (10th Cir. 2000) (citing *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997)).

Dated: March 1, 2016

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE