**In the United States District Court for
the District of Kansas**

---

In re: CCA Recordings 2255 Litigation,
                                    **Petitioners,**

v.

                          **Case No. 19-cv-2491-JAR-JPO**
                          **(This Document Relates to Case 14-cr-20096-JAR-**
                          **10,** *United States v. Herbert Saysoff*, **and Case No.**
                          **18-cv-2570-JAR-JPO,** *Herbert Saysoff v. United*
                          *States*)

United States of America,
                                    **Respondent.**

---

### MEMORANDUM AND ORDER

This matter is before the Court on Petitioner Herbert Saysoff's Motion to Vacate and

Discharge with Prejudice under 28 U.S.C. § 2255 (Doc. 559).[1]  Petitioner alleges the government

violated the Sixth Amendment by intentionally and unjustifiably becoming privy to his attorney-

client communications.  As a remedy, he asks the Court to vacate his judgment with prejudice to

refiling or alternatively, to reduce his term of imprisonment by approximately 50%, vacate his

term of supervised release and restore any forfeited money.  The government has responded,

opposing the motion and seeking dismissal on jurisdictional grounds.[2]  For the reasons explained

---

[1] Unless otherwise specified, citations prefaced with "Doc." refer to filings and docket entries in an
underlying criminal case, No. 14-cr-20096-JAR-10.  Citations prefaced with "*CCA Rec. Lit.*, Doc." refer to filings
and entries in this consolidated case, No. 19-2491-JAR-JPO.  With the exception of *United States v. Carter*, No. 16-
20032-JAR, Doc. 758 (D. Kan. Aug. 13, 2019) ("*Black* Order"), citations to filings in No. 16-20032-JAR are
prefaced with "*Black*, Doc."

[2] *Saysoff v. United States*, 18-2570-JAR-JPO, Docs. 3, 4, 5.

in detail below, Petitioner's challenge to his conviction and sentence are dismissed for lack of standing.

## I.      Background

### A.      Procedural History

The October 22, 2014 Indictment charged Petitioner, who was one of a number of other defendants, with one count of conspiracy to possess methamphetamine with intent to distribute and one count of possessing methamphetamine with intent to distribute.[3]  On April 13, 2016, Saysoff pleaded guilty to the conspiracy count in accordance with a binding plea agreement, pursuant to Fed. R. Crim. P. 11(c)(1)(C).[4]  As part of the agreement, the parties proposed that the Court sentence Petitioner to a total term of 180 months' imprisonment followed by a five-year term of supervised release.[5]  The Court agreed to be bound by the plea agreement at the change of plea hearing.[6]  On August 8, 2016, this Court sentenced Petitioner to 180 months' imprisonment and five years' supervised release.[7]  Petitioner did not file a direct appeal of his conviction or sentence, nor has he filed a prior habeas motion under 28 U.S.C. § 2255.

Petitioner was represented by Clinton W. Lee in the underlying criminal proceedings. The Court appointed the Federal Public Defender ("FPD") to represent Petitioner in his § 2255 proceedings on July 17, 2018.[8]  On October 24, 2018, the FPD filed a motion pursuant to § 2255 on Petitioner's behalf, setting forth a single ground for relief: the government violated  the Sixth

---

[3] Doc. 47.

[4] Docs. 277, 279.

[5] Doc. 279.

[6] Doc. 569 at 23.

[7] Doc. 354.

[8] Standing Order 18-3.

Amendment by intentionally and unjustifiably intruding into his attorney-client relationship.[9]
The government responded and Petitioner replied.[10]  Petitioner is currently incarcerated at USP
Leavenworth, and his release date is September 30, 2027.[11]

  **B.**  **The *Black* Investigation and Order**

  The Court assumes the reader is familiar with its ruling in *United States v. Carter* ("*Black*
Order") that precipitates the § 2255 motions before the Court.[12]  That comprehensive opinion
was intended to provide a record for future consideration of the many anticipated motions filed
pursuant to § 2255 and is incorporated by reference herein.  The Court does not restate the
underlying facts and conclusions of law in detail but will provide excerpts from the record as
needed to frame its discussion of the issues presently before it.

  Petitioner seeks relief based on events that came to light in the *Black* case and
investigation, which involved audio recordings of telephone conversations and soundless video
recordings of meetings between attorneys and their clients who were incarcerated at CCA.  The
government admits that it obtained videos from CCA in connection with the *Black* case, which
focused on drug and contraband trafficking inside CCA.  The government's possession of these
recordings came to light in August 2016, when then-Special Assistant United States Attorney
("SAUSA") Erin Tomasic and AUSA Kim Flannigan accused defense attorney Jacquelyn
Rokusek of "jeopardiz[ing] their investigation" in *Black* based on information they claimed to

---

  [9] *Saysoff*, 18-2570-JAR-JPO, Docs. 1, 5.

  [10] *Id.*, Docs 3, 4.

  [11] Federal Bureau of Prisons, *Inmate Locator*, https://www.bop.gov/inmateloc/ (last visited Mar. 30, 2021).

  [12] Case No. 16-20032-JAR, Doc. 758 (D. Kan. Aug. 13, 2019).  As discussed in that Order, the Sixth
Amendment claims stem from recordings of conversations and meetings with counsel while they were detained at
Corrections Corporation of America ("CCA").  That facility has since been renamed CoreCivic.  For convenience,
the Court refers to it as CCA in this Order.

have gleaned from the video recordings.[13]  The defense also discovered that the  United States

Attorney's Office for the District of Kansas ("USAO") had routinely obtained CCA recorded

attorney-client phone calls, and that it did so without notice to the attorneys, clients, or courts.[14]

Once notified of the video and audio recordings, this Court ordered (1) all local federal

detention facilities to cease recording attorney-client meetings and phone calls;[15] (2) the video

and audio recordings in USAO custody to be impounded;[16] and (3) the government to preserve

its computer hard drives.[17]  By October 11, 2016, the Court had appointed a Special Master to

assist in what the Court termed "Phase I and Phase II" of the Court's investigations, that is, to

determine the number of recordings possessed by the government and how to index and

segregate them, and to identify privileged or confidential information within those recordings.[18]

On January 31, 2017, the Special Master issued the "First Report Regarding Video

Recordings."[19]  The Special Master determined that the government had obtained from CCA

video recordings of the attorney-inmate rooms made between February 20, 2016, and May 16,

2016—a period of 86 days, or approximately 14,000 hours—documenting approximately 700

attorney visits.[20]  This Court in *Black* found that the USAO did not come into possession of the

---

[13] *Id.* at 70–80.

[14] *Id.* at 29–30.

[15] *Black*, Doc. 253 at 3.

[16] *Id.* at 3, 12 ("The Court subsequently issued a clawback order directing the government to gather and surrender to the Court all audio recordings in its possession, in the possession of investigative agencies, and in the possession of other defendants who had received them in discovery.").

[17] *Id.* at 40.  At the September 7, 2016 hearing in *Black*, "[t]he Court ordered the government to retain and preserve all of the hard drives as well as all of the hardware necessary to access the information on the hard drives." *Id.*

[18] *Black*, Doc. 146 (Appointment Order).

[19] *Black*, Doc. 193.

[20] *Id.* at 3, 5 (specifically, CCA Attorney Meeting Rooms 3 and 6 through 9).

CCA videos until June 1, 2016.[21]  The Court has since clarified that the government's possession of the video recordings began when the United States Secret Service picked up DVR 6 from CCA on May 17, 2016.[22]  There is no dispute that the USAO disgorged the video recordings to the Court on August 9, 2016.  Nor is there evidence that the government maintained copies of the video recordings on a computer (the "AVPC") or on Special Agent Jeff Stokes's laptop after that time.[23]

The government did not cooperate with the Special Master's investigation, however, and its failure to cooperate ultimately resulted in a lengthy delay in this Court's ability to rule on these issues.  Finally, despite the delay associated with the government's failure to cooperate and its litigation efforts challenging the propriety of the Special Master's investigation, the Court conducted a full evidentiary hearing on all pending matters in *Black* in October and November 2018.

On August 13, 2019, the Court issued the *Black* Order, which detailed, among other things, the government's view that soundless video recordings are not protected communications and rejected the government's argument that the communication in the videos is too rudimentary to discern whether it involves legal advice or strategy or to disclose the content of any accompanying verbal communication.[24]  The Order also addressed the governing standard for an intentional-intrusion Sixth Amendment claim in the Tenth Circuit.[25]  The Order discussed the elements required to prove a per se violation of the Sixth Amendment under the Tenth Circuit

---

[21] *Black* Order at 66.

[22] *CCA Rec. Lit.*, Doc. 784 at 13.

[23] *Id.*, Doc. 546 (Petitioners' Notice of Errata withdrawing any such allegations individually or collectively advanced).

[24] *Black* Order at 164–65.

[25] *Id.* at 145–62.

decision in *Shillinger v. Haworth*,[26] which held that a per se Sixth Amendment violation occurs when: (1) there is a protected attorney-client communication; (2) the government purposefully intruded into the attorney-client relationship; (3) the government becomes "privy to" the attorney-client communication because of its intrusion; and (4) the intrusion was not justified by any legitimate law enforcement interest.[27]  Once those elements are established, prejudice is presumed.[28]

    The Court further held that a finding of purposeful intrusion into the attorney-client relationship necessarily requires a threshold showing that the recordings were protected attorney-client communications.[29]  While recognizing that the attorney-client privilege is not a right guaranteed by the Sixth Amendment, the Court applied principles relating to the privilege as a framework for this showing that the recordings between petitioners and counsel were protected communications under the Sixth Amendment.  With respect to the video recordings, the Court determined that the following threshold showings must be made after review and verification by the FPD: (1) the video of the attorney-client meeting exists; and (2) the quality of the non-verbal communication in the video is sufficient to confirm communication between the detainee and counsel.[30]  This threshold showing requires an affidavit from defense counsel confirming that the nature and purpose of the meeting(s) were within the ambit of protected communication, including but not limited to defense preparation, plea negotiations, or review of discovery.[31]

---

[26] 70 F.3d 1132 (10th Cir. 1995).

[27] *Black* Order at 162 (citing *Shillinger*, 70 F.3d at 1142).

[28] *Id.*

[29] *Id.* at 163.

[30] *Id.* at 166.

[31] *Id.*

C.       **Proceedings in Consolidated Master Case**

The *Black* Order reassigned all *Black*-related § 2255 motions pending before other judges in the District to the undersigned for determination of the merits of petitioners' Sixth Amendment claims and for consolidated discovery.[32]  It was this Court's intent that by reassigning the habeas actions to the undersigned and consolidating the cases for discovery, the process for seeing over 100 cases to completion would be streamlined for all parties.

The Court also assumes the reader is familiar with the proceedings in the consolidated master case that precipitates the matter before the Court, and does not restate the underlying facts in detail but will provide excerpts from the record as needed to frame its discussion of the issues presently before it.  In addition to the two threshold showings recited above, this Court stated during a September 2019 status conference that the privilege logs for video recordings would need to describe the specific topic of any confidential attorney-client communication, for example, plea negotiations as well as an indication that "some nonverbal communication going on about that [topic] that . . . is observable."[33]  The government argues that many of the privilege logs fail this subjective test because (1) many of them do not describe the topic of any communication or describe the communicative value of any observable nonverbal gestures; (2) boilerplate statements that a video reveals attorney communications or that communication was about legal advice and strategy are too vague; and (3) physical gestures such as pointing to documents or a laptop alone are not sufficient to establish privileged attorney-client communications are depicted on a soundless video.  The Court must review the recordings in

---

[32] *CCA Rec. Lit.*, Doc. 1.

[33] *Id.*, Doc. 21 at 50.

order to rule on these objections, and will do so on a case-by-case basis as needed.  There is no need for such particularized review in the instant case.

As detailed in the Court's October 15, 2020 Orders, the parties' initial efforts at cooperation culminated in the government's notice that it refuses to comply with discovery orders and demands that the Court rule immediately on both the procedural and merits defenses raised in its responses to the § 2255 motions.[34]  Highly summarized, the Court: (1) reaffirmed its previous ruling on the government's implied waiver argument and, in light of the government's blanket objections to petitioners' privilege logs, established a procedure for *in camera* review of the recordings; (2) reaffirmed the finding that soundless video recordings may be protected communications and found that petitioners did not waive any protection because the attorney meeting rooms were monitored; (3) ordered the parties to supplement their responses and replies to address jurisdictional defenses and the collateral-attack waiver by plea agreement issue; and (4) found the government's refusal to comply with discovery orders issued by the Court sanctionable under Fed. R. Civ. P. 37(b)(2) and notified the government of its intent to take as conclusively established certain facts petitioners might have proved regarding the "privy to" element of their Sixth Amendment claims with for any petitioner who establishes that he or she is entitled to an evidentiary hearing.[35]

On January 18, 2021, the Court issued an order: (1) reaffirming and expanding its holding regarding the applicable Sixth Amendment standard; (2) addressing the collateral-waiver by plea issue; and (3) addressing jurisdictional defenses raised by the government, including certification

---

[34] *Id.*, Docs. 587, 588.

[35] *Id.*

requirements under Rule 2(b) of the Rules Governing Section 2255 Proceedings.[36]  Petitioner

timely filed a Signed Rule 2(b)(5) Verification on February 25, 2021.[37]

### D.     Recording in this Case

Petitioner was detained at CCA from December 22, 2014 through August 30, 2016.[38]  On

August 13, 2019, this Court released the video recordings to the FPD as a result of the *Black*

investigation.[39]  The government received one video recording of Petitioner meeting with Lee at

CCA on April 11, 2016.  Petitioner was prosecuted by SAUSA Tomasic and AUSA David

Zabel, and Zabel stated in an affidavit that he was not aware of the video recording of the

meeting nor did he review it.[40]

Pursuant to the Court's Order, Petitioner provided a privilege log detailing the claimed

protected communication, verifying that during this meeting, Petitioner discussed matters

"relating to legal advice and strategy" with Lee.[41]  Petitioner also provided a sworn declaration

from Lee, stating that he reviewed the video recording listed on the privilege log, and confirmed,

with respect to the recorded meetings and each other meeting with Petitioner at CCA: (1) the

only reason he met with Saysoff "was to discuss matters related to legal advice or strategy; and

(2) he had no knowledge nor did he believe that the meetings were recorded as they were

attorney-client protected, that he did not consent to such, and that he was not aware such

recordings would be dispensed to prosecutors.[42]

---

[36] *Id.*, Doc. 730 (clarified and reconsidered in part on other grounds, *id.*, Doc. 784).

[37] *Id.*, Doc. 775.

[38] *Saysoff*, 18-2570-JAR-JPO, Doc. 3-1.

[39] *Black* Order at 165.  The FPD took possession of the DVR hard drives on August 16, 2019. *Black*, Doc. 761.

[40] *Saysoff*, 18-2570-JAR-JPO, Doc. 3-1.

[41] *CCA Rec. Lit.*, Doc. 205-2 at 176–77.

[42] *Saysoff*, 18-2570-JAR-JPO, Doc. 4-1.

The Court reviewed the video recording *in camera*.  As set out in the privilege log, the Court confirms that the video recording shows Petitioner meeting with Lee.  In light of the analysis below, however, the details of the meeting visible in the video are not pertinent and will not be discussed in this order.

## II.    Discussion

Saysoff lacks standing to challenge either his conviction or sentence under § 2255, although each claim fails for a different reason.  The standards for the justiciability are identified below, followed by this Court's analysis of the timing issues relevant to Petitioner's conviction challenge and the impact of the binding plea agreement on his sentencing challenge.

### A.    Justiciability Standards

Article III of the Constitution gives federal courts the power to exercise jurisdiction only over "Cases" and "Controversies."  Federal courts must have a statutory or constitutional basis to exercise jurisdiction.[43]  And, without jurisdiction, a court must dismiss the case.[44]  Courts thus must determine, either *sua sponte* or upon a challenge by a party "at any stage in the litigation," whether subject matter jurisdiction exists.[45]  Article III's case-or-controversy requirement applies at all stages of litigation.[46]  There are three basic elements of standing: (1) an injury, (2) a causal connection between that injury and conduct complained of in the motion, and (3) the likelihood that court action could redress that injury.[47]  To demonstrate causation, a party must show that

---

[43] *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002).

[44] *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

[45] *Arbaugh,* 546 U.S. at 506 (explaining that challenges to subject matter jurisdiction "may be raised . . . at any stage in the litigation, even after trial and the entry of judgment.").

[46] *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990).

[47] *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 2021 WL 850106, at *2 (2021).

their alleged injury is "fairly traceable" to the complained of conduct.[48]  "Article III . . . require[s] proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact."[49]  "If 'speculative inferences are necessary to connect [a plaintiff's] injury to the challenged action,' this burden has not been met."[50]

### B.    Timing of the Alleged Violations

The recorded meeting between Petitioner and Lee took place on April 11, 2016, before he entered his guilty plea on April 13, 2016, and before he was sentenced on August 8, 2016.  As noted above, the USAO did not have possession of and access to the video recordings until May 17, 2016, and it gave up possession when it disgorged the videos to the Court on August 9, 2016.  Thus, any alleged Sixth Amendment violation could not have occurred until after Petitioner entered a guilty plea, leaving no redressable injury with respect to his conviction.

As this Court discussed in its January 18, 2021 Order, when the intrusion occurs after the petitioner entered a plea, "the intrusion cannot be tied to any claimed unfairness or impropriety in the conviction [or] plea . . . .  Without such a nexus, these petitioners cannot proceed with claims challenging  . . . their convictions . . . ."[51]  Petitioner cannot demonstrate an injury or any nexus between an injury and the USAO's conduct, and thereby cannot satisfy the minimal requirements for standing.  The Court concludes that Petitioner lacks standing to challenge his conviction and plea.

---

[48] *Habecker v. Town of Estes Park*, 518 F.3d 1217, 1225 (10th Cir. 2008) (*citing Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992)).

[49] *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005) (citations omitted).

[50] *Id.* at 1157 (*quoting Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 45 (1976)).

[51] *See CCA Rec. Lit.*, Doc. 730 at 53.

11

### C.       Binding Plea Agreement

Standing requires an "injury in fact," a causal connection between the injury and the

conduct alleged, and the possibility of redressability.[52]  Upon careful review of the authority

governing resentencing for a defendant subject to a binding plea agreement, the Court concluded

in its order addressing motions for reconsideration that a resentencing court would be unable to

provide any sentencing relief for petitioners subject to binding plea agreements under Fed. R.

Crim. P. 11(c)(1)(C).[53]

Under Rule 11(c)(1)(C), "[a] plea agreement may specify that an attorney for the

government will: . . . agree that a specific sentence or sentencing range is the appropriate

disposition of the case . . . (such a recommendation or request binds the court once the court

accepts the plea agreement)."  The Tenth Circuit has emphasized that, according to this

language, the sentencing court lacks discretion to consider anything outside of the plea

agreement and is bound by the terms of the agreement once it has accepted it.[54]  Although the

Supreme Court has recognized some limited authority for a court to reduce a sentence imposed

in accordance with a binding plea agreement under 18 U.S.C. § 3852(c)(2) when the agreed-

upon sentence is based on sentencing guidelines that are subsequently amended, that limited

sentence modification authority is not relevant here.[55]  When a district court adopts a binding

---

[52] *Simon*, 426 U.S. at 38–43.

[53] *CCA Rec. Lit.*, Doc. 784 at 23–27.

[54] *See United States v. Fields*, 339 F. App'x 872, 874 (10th Cir. 2009) ("Where, as here, the District Court accepted a so-called 'C' plea, the answer is simple: the sentence is based on the terms expressly agreed on by the defendant and the government. . . . the Court lacked the discretion to consider anything outside of the parties' agreement in sentencing him.") (quoting *United States v. Sanchez*, 562 F.3d 275, 282 n.8 (3d Cir. 2009)).

[55] *Freeman v. United States*, 564 U.S. 522, 529–32 (2011).  The Tenth Circuit has applied *Freeman* several times and continues to recognize the binding nature of Fed. R. Crim. P. 11(c)(1)(C) pleas.  *See, e.g., United States v. Gilmore*, 841 F.3d 909, 913–14 (10th Cir. 2016) (holding that Rule 11(c)(1)(C) pleas are binding on the sentencing court once it adopts it, with sentence modification narrowly allowed under *Freeman*).

plea agreement, and thereby agrees to be bound by that agreement, its discretion at sentencing is limited to the terms of that agreement.

This discretion is not broadened by vacatur of a sentence granted under § 2255.  At resentencing, the scope of sentencing authority is not limited by the vacated sentence and the court considers the defendant as though he had never been sentenced, absent a controlling mandate that imposes specific limitations.[56]  As with the recordings, however, there are critical temporal considerations with respect to Petitioner's binding plea.  Rule 11(c)(1)(C) indicates that the parties' agreed recommendation "binds the court once the court accepts the plea agreement." The time at which the court agreed to be bound by the plea agreement determines whether, at resentencing, the court would still be bound or if it would be able to exercise its broad discretion to reject the plea agreement.[57]  If the court agreed to be bound by the plea agreement at the change-of-plea hearing, a sentencing court would still be bound by that agreement even if the sentence is vacated under § 2255 and resentencing is granted.[58]  Fitting these parameters, Saysoff lacks standing to challenge his sentence, including any term of supervised release, as there is no

---

[56] *See, e.g., United States v. Rayford*, 552 F. App'x 856, 859 (10th Cir. 2014) (following vacatur of a sentence under § 2255, "Defendant's original sentence had no continuing effect on him.  Because Defendant's original sentence had been vacated, he stood before the district court as if he had not yet been sentenced.").

[57] *See United States v. Robinson*, 45 F.3d 1423, 1437–39 (10th Cir. 1995) (discussing district court's broad discretion under Rule 11 to reject or accept plea agreements, with some distinctions based on the content of the plea agreement.); *see also United States v. Rakes*, 510 F.3d 1280, 1286 (10th Cir. 2007) ("A district court enjoys substantial discretion in deciding whether to accept or reject a plea agreement.") (citing *Robinson*, 45 F.3d at 1437).

[58] *Rayford*, 552 F. App'x at 859 (holding vacatur of sentence requires resentencing as if sentencing never occurred).  Unless the conviction is also vacated, nothing that occurred at the change of plea hearing would be altered, maintaining the binding effect of the Court's adoption of the plea agreement.  *See CCA Rec. Lit.*, Doc. 784 at 23–27.

possibility of redressability even if the sentence is vacated.[59]  Accordingly, the Court dismisses Saysoff's sentencing challenge.[60]

### III.    Certificate of Appealability

Rule 11 of the Rules Governing Section 2255 Proceedings states that the Court must issue or deny a certificate of appealability ["COA"] when it enters a final order adverse to the applicant.  "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."[61]  If the district court denies a habeas petition on procedural grounds without reaching the merits of petitioner's underlying constitutional claim, "the prisoner must show both (1) 'that jurists of reason would find it debatable whether the district court was correct in its procedural ruling' *and* (2) 'that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right.'"[62]  For the reasons explained above, Petitioner has not met either showing and the Court therefore denies a COA.

**IT IS THEREFORE ORDERED BY THE COURT** that petitioner Herbert Saysoff's Motion to Discharge and Vacate with Prejudice Under § 2255 (Doc. 559) is **dismissed**.  Saysoff is also denied a certificate of appealability.

**IT IS SO ORDERED.**

---

[59] A sentencing court can set aside an adopted binding plea agreement only if there has been fraud on the court.  *United States v. Black*, 201 F.3d 1296, 1303 (10th Cir. 2000).  No interpretation of the § 2255 motion here suggests any reason to believe that any such fraud allegation would or could permit this Court to set aside the plea agreement.

[60] Because lack of jurisdiction provides a sufficient basis to dismiss Petitioner's § 2255 motion, the Court does not address the government's other argument regarding procedural default.

[61] 28 U.S.C. § 2253(c)(2).

[62] *United States v. Park*, 727 F. App'x 526, 528 (10th Cir. 2018) (emphasis in original) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Dated: <u>March 31, 2021</u>

<u> S/ Julie A. Robinson</u>
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE